## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

DELJACK, INC., an Idaho corporation,

                Plaintiff,

v.

U.S. BANK NATIONAL
ASSOCIATION, a national banking
association,

                Defendant.

Case No. 1:11-cv-00065-EJL

**MEMORANDUM DECISION AND
ORDER**

### INTRODUCTION

Pending before the Court are the parties' cross-motions for summary judgment. (Dkts. 35, 37). Additionally, plaintiff has filed a motion for leave to file an amended complaint seeking punitive damages (Dkt. 36). The matter has been fully briefed and the Court has determined oral argument would not assist the decision-making process. The Court will therefore decide the motions without a hearing. For the reasons explained below, the Court will deny both motions.

### FACTS

Plaintiff DelJack, Inc. operates a business in Boise, Idaho known as the Crescent "No Lawyers" Bar & Grill. A long-time DelJack employee, Kristi "Cookie" Hurles, embezzled large sums of money from the company during roughly 2006 through 2010.

Hurles' responsibilities at the Crescent included serving, bartending, and bookkeeping.  She was often tasked with personally depositing DelJack's daily cash receipts, along with company checks, into DelJack's bank account at U.S. Bank.

The cash component of the daily deposit is easy to explain – it came from the company's business operations.  Explaining the company checks is somewhat more complicated, and the specific facts related to that issue are discussed below.  The key fact that emerges, however, is that Hurles often went to the bank with DelJack company checks in hand.  These checks were made out to cash and contained the very common restrictive indorsement – "For Deposit Only" – on the backside.

U.S. Bank did not honor the restrictive indorsement on many of these checks. Instead, the bank handed cash over the counter to the person who showed up with the checks.  Within the three-year period before this action was filed, the bank violated the For-Deposit-Only indorsement on 127 separate checks, which total $86,500.[1]  DelJack seeks to recover that $86,500 in this action.

A key factual dispute is the scope of authority DelJack granted to Hurles. The bank says DelJack entrusted Hurles to cash the For-Deposit-Only checks and bring the

---

[1] For purposes of deciding this motion, the Court finds that 127 checks are at issue, and will sometimes refer to these checks as the "For-Deposit-Only Checks."  The Court bases its conclusion that 127 checks are at issue on DelJack's summary of the For-Deposit-Only Checks, *see Ex. A to Berriochoa Aff,* which includes information on 127 separate checks.  The bank does not dispute that these checks were cashed, nor does it discuss any check individually.  But at one point in its briefing, DelJack inexplicably refers to 84 – rather than 127 – checks.  *See DelJack's Mot. Memo.*, Dkt. 38, at 12 ("U.S. Bank failed to apply the proceeds of one-hundred twenty seven (127) DelJack checks consistently with those checks' restrictive endorsements.  Thus, U.S. Bank committed eighty four (84) separate acts of conversion rendering it liable for the amounts of those eighty four (84) checks.") (footnote citations omitted).  Neither DelJack nor the bank provides any explanation for this disconnect.  The Court will therefore assume a clerical error.

cash back to the bar.  DelJack, however, says Hurles had no such authority, and that she was supposed to deposit the For-Deposit-Only checks – not cash them.

### THE LEGAL STANDARD

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

The party moving for summary judgment has the initial burden of showing there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986).  Material facts are those necessary to the proof or defense of a claim, and are determined by reference to substantive law.  *Id.* at 248.  A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Once the moving party has met its initial burden, the nonmoving party has the burden of presenting evidence to show that a genuine issue of fact remains. The party

opposing the motion for summary judgment may not rest upon the mere allegations or

denials of her pleading, but must set forth specific facts showing that there is a genuine

issue for trial. *Id*. at 248.  If the non-moving party "fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial" then summary judgment is proper as "there

can be no 'genuine issue of material fact,' since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts

immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).[2]

In applying the above standard, the Court must view the evidence in the light most

favorable to the non-moving party. *Anderson*, 477 U.S. at 255.  Additionally, when

parties cross-move for summary judgment, the Court will consider each motions on its

own merits.  *Fair Housing Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.

2001).  Nonetheless, in ruling on cross-motions, the Court will consider the entirety of

each party's evidentiary submission, regardless of which motion (or opposition) the

evidence accompanied.  *Id.* at 1136-37.

---

[2]  See also Rule 56(e) which provides:

If a party fails to properly support an assertion of fact or fails to properly address another
party's assertion of fact as required by Rule 56(c), the court may:

    (1)    give an opportunity to properly support or address the fact;
    (2)    consider the fact undisputed for purposes of the motion;
    (3)    grant summary judgment if the motion and supporting materials—including the
            facts considered undisputed-show that the movant is entitled to it; or
    (4)    issue any other appropriate order.

## U.S. BANK'S MOTION FOR SUMMARY JUDGMENT

DelJack alleges three claims against U.S. Bank – negligence, conversion, and declaratory judgment. The parties agree that the statutory limitations period for each of these claims is three years. *See* Idaho Code § 28-3-118(7) (three-year statute for conversion of an instrument); *id.* § 28-4-111 (three-year statute for actions relative to bank deposits and collections). Here, DelJack is seeking to recover checks cashed within this three-year limitations period – November 2, 2007 through November 2, 2010.

The bank contends that two separate provisions of its Deposit Account Agreement independently bar DelJack's lawsuit. The first provision comes under the heading "Your Duty to Examine Your Statement," and the other under the "Number of Signatures" heading. The Court will address each provision in turn.

### A.     Duty to Examine Bank Statements

The bank first argues DelJack is barred from suing because it failed to examine its account statements and, within 30 days of receiving those statements, notify the bank of its failure to deposit the "For Deposit Only" checks. The bank relies on the following provision of the Deposit Account Agreement:

> **Your Duty to Examine Your Statement**. As used in this section, the term "problem" means any error, alteration or unauthorized transaction (including, but not limited to, forged or missing signatures and excluding consumer electronic banking transactions) related to your account. Because you are in the best position to discover any problem, you will promptly examine your statement and report to us any problem on or related to your statement. You agree that we will not be responsible for any problem that:
>
> (1)     you do not report to us in writing within a reasonable time not to exceed 30 calendar days after we mail the statement (or make the

statement available) to you,

(2)     results from a forgery, counterfeit or alteration so clever that a reasonable person cannot detect it (for example, unauthorized checks made with your facsimile or other mechanical signature device or that look to an average person as if they contain an authorized signature; or

(3)     as otherwise provided by law or regulation.

. . .

You may not start a legal action against us because of any problem unless: (a) you have given us the above notice and (b) the legal action begins within 1 year after we send or make your statement available to you.

*See Sept. 15, 2009 Deposit Account Agreement, Ex. D-7 to Leonard Aff.,* Dkt. 35-13, at

20-21.[3]

### 1.     The Meaning of the Contractual Provision

The Court cannot find that this provision is susceptible to the meaning the bank

gives it.  That is, this section does not obligate DelJack to notify the bank of the bank's

own failure to comply with restrictive indorsements.  The provision does not even

mention restrictive indorsements, much less the consequences of a bank's failure to

comply with such an indorsement.  Rather, when the section is viewed in context, it is

apparent that the bank has just shortened the one-year statutory period for customers to

alert banks of forged or unauthorized signatures.  *See* Idaho Code § 28-4-406.  The

---

[3] The bank provided eight versions of the Deposit Account Agreement, indicating that all versions contain substantially similar language in the section entitled "Your Duty to Examine Your Statement.  *See Leonard Aff.*, Dkt. 35-7, ¶ 9; *see also Exs. B and D1 to D7 of the Leonard Aff.*, Dkt. 35-7.  It appears, however, that just three versions were in effect during the operative time period – November 2007 through November 2010:  (1) Exhibit D-5 (effective March 15, 2007); (2) Exhibit D-6 (effective June 1, 2009); and (3) Exhibit D-7 (effective September 15, 2009).  And the bank is correct in that the section at issue here (again, the one entitled "Your Duty to Examine Your Statement") is identical in each of these three versions.  For ease of reference, the Court will cite to the latest, September 15, 2009 version (Exhibit D-7).

relevant UCC provision obligates customers to examine their statements for unauthorized signatures or alterations, and allows customer up to one year to notify the bank of such issues. *Id.* The agreement here shortens that notice period to 30 days.

The bank correctly points out that numerous courts have upheld deposit agreements that significantly shorten the statutory one-year period; in fact, one court upheld an agreement that shrunk the notice period to just 14 days. *See Parent Teacher Ass'n v. Mfrs. Hanover Trust Co.*, 524 N.Y.S. 2d 336, 340 (N.Y. Civ. Ct. 1988) ("PTA was under a contractual duty to notify MHT in writing of any forgery or signature not in accordance with the signature card within fourteen days"); *see also, e.g., Tatis v. U.S. Bancorp,* 473 F.3d 672, 674-77 (6th Cir. 2007); *Peters v. Riggs Nat'l Bank*, 942 A.2d 1163, 1166-68 (D.C. 2008) (citing cases). But these cases typically deal with the customer's duty to alert the bank of forgeries. None held that a bank had imposed a duty on its customer to alert the bank of the bank's own failure to comply with a restrictive indorsement. The cases cited by the bank are thus inapposite.

The bank insists that because the term "problem" is defined in the agreement to include "any error" or "unauthorized transaction" "related to your account," DelJack's duty to report "problems" necessarily included a duty to report the bank's own failure to comply with the restrictive indorsement. But in making this argument, the bank is ignoring the central part of the provision, which states, "Because you [the customer] are in the best position to discover any problem, you agree to promptly examine your statement and report to us any problem . . . ." *Id.* at 20.

The UCC drafters realize that customers – not the banks – are in the best position

to discover forgeries and altered signatures.  *See, e.g.,* Idaho Code § 28-4-406, cmt. 5

("there is little excuse for a customer not detecting an alteration of his own check or a

forgery of his own signature").  That is why § 4-406 obligates customers to notify the

bank of unauthorized signatures or alterations.  *See, e.g., Garnac Grain Co. v. Boatmen's*

*Bank & Trust Co.* , 694 F. Supp. 1389, 1400 (W.D. Mo. 1988) ("section 4-406 was

intended to encourage bank customers to promptly and diligently examine their bank

statements in order to discover forgeries and alterations.").  But the opposite is true for

restrictive indorsements.  In this situation, it is the bank that is in the first and best

position to discover the problem.  As one court explains, when a depositary bank

disregards a for-deposit-only indorsement, it

> not only subjects itself to liability for any losses resulting from its
> actions, but it also passes up what may well be the best opportunity to
> prevent the fraud.  The presentation of a check in violation of a
> restrictive indorsement for deposit in the account of someone other than
> the restrictive indorser is an obvious warning sign, and the depositary
> bank is required to investigate the situation rather than blindly accept
> the check.

*Underpinning & Found. Constructors, Inc. v. Chase Manhattan Bank*, 386 N.E. 2d 1319,

1324 (N.Y. 1979).  And so it is here.  In this case, the problem presented itself right at the

bank counter, when a non-signatory on the account showed up with checks marked "For

Deposit Only," and requested cash instead.

    Additionally, the contractual provision at issue here expressly mentions forgeries

and obligates customers who make a claim against the bank to complete an affidavit of

forgery.[4]  *Deposit Account Agmt.*, at 21. It states:

> Within 30 days of mailing you agree to complete and return an affidavit of forgery on the form we provide you along with other information we may request.  You further agree to file a police report if we request.

*Deposit Agmt.*, at 21 (emphasis added).  The requirement to submit an affidavit of forgery bolsters the Court's conclusion that this section is intended to deal with forgeries and similar issues (again, issues that the customer is in the best position to detect).  An affidavit of "forgery" would have little bearing on the bank's failure to comply with a restrictive indorsement.

The Eighth Circuit addressed a somewhat similar issue in *Douglas Companies v. Commercial National Bank of Texarkana*, 419 F.3d 812 (8th Cir. 2005).  In that case, the plaintiff deposited a $240,000 check, but the bank dropped a zero when it coded the check, thus crediting the plaintiff with a $24,000 deposit.  The plaintiff sued to get a credit for the missing $216,000.  The bank, however denied liability.  It argued that plaintiff was barred from suing based on the parties' account agreement, which required plaintiff to review its bank statement and timely notify the bank of "'any unauthorized signatures, alterations, forgeries or *any other errors* in your account within 60 days of when we [the bank] make the statement available . . . .'"  *Id.* at 817.

---

[4] The bank indicated that affidavits of forgery are not required but, rather, are similar to police reports, which are required only if the bank requests one.  But it appears that the bank is relying on an older version of the Deposit Account Agreement.  *See Ex. B to Leonard Aff.,* Dkt. 35-8, at 14 ("If we request, you agree to complete an affidavit of forgery or other proof of loss."); *Ex. D-1,* Dkt. 35-9, at 14 (same).  These earlier versions did not mention police reports.  Later versions say that a police report must be submitted *if the bank requests*, but the affidavit of forgery appears mandatory.  *See Deposit Account Agreements reproduced as Exhibits D-2 through D-7 to the Leonard Aff.*

The court disagreed, upholding the district court's conclusion that the agreement related "only to alterations or forgeries resulting in unauthorized payments from the account, . . . ." *Id.* As the court explained,

> The agreement . . . was intended to modify § 4-4-406 which deals with a customer's duty to discover and timely report unauthorized signatures or alterations; the section says nothing about encoding errors. We do not believe the agreement, which modified the time and notice provisions, otherwise changed the scope of § 4-4-406. Further, we find no authority, and CNB fails to cite any, permitting parties to expand the scope of § 4-4-406 to impose a duty on customers to give notice of encoding errors. In the absence of such authority, we hold the agreement applies only to the types of transactions or errors specifically identified in § 4-4-406, i.e., unauthorized signatures and alterations.

*Id.* (emphasis added).

The result is the same here. The Court cannot conclude that the parties agreed to impose a duty on DelJack to notify the bank of the bank's failure to comply with a restrictive indorsement. The Court will therefore deny the bank's motion for summary judgment on this basis.

**2.      Idaho Code § 29-110**

Another problem with the bank's argument regarding the 30-day period is Idaho Code § 29-110. This statute provides that any contractual provision purporting to shorten a limitations period "is void as it is against the public policy of Idaho." Idaho Code § 29-110(1). Here, by requiring DelJack to notify the bank of "problems" within 30 days of receiving its statement, and to sue within one year, the parties effectively agreed to

shorten the otherwise applicable three-year limitations periods.[5]

The bank argues that Idaho Code § 29-110 is not applicable in commercial code cases because, within the commercial code, the legislature provided that "the effect of the provisions of the uniform commercial code may be varied by agreement."  Idaho Code § 28-1-302.  As noted above, the parties agree that the limitations period applicable here are contained within the commercial code.  *See* Idaho Code § 28-3-118(7) (three-year statute for conversion of an instrument); *id.* § 28-4-111 (three-year statute for actions relative to bank deposits and collections).  So it appears that these two statutes (Idaho Code § 29-110 and § 28-1-302) are at odds with each other, and the Court must decide which applies.

The Court will resolve the issue by relying on the more specific statute.  Idaho Code § 29-110 speaks specifically to the issue presented here – the ability to contractually shorten limitations periods.  Idaho Code § 28-1-302 speaks more generally to the ability to modify "provisions of the uniform commercial code."  Moreover, in another part of the commercial code, the legislature very specifically stated that the parties could shorten limitations period.  Specifically, Idaho Code § 28-2-725 provides: An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued.  *By the original agreement the parties may reduce period of limitation to not less than one (1) year but may not extend it.*"  Idaho Code § 28-2-725 (emphasis added).  According to the bank's logic, this specific language within

---

[5] The Court does not agree that the parties agreed to disclaim the bank's obligations of "good faith, diligence, reasonableness, and care prescribed by the Uniform Commercial Code." Idaho Code § 28-1-302.

the commercial code would be entirely unnecessary, given the more general language in Idaho Code § 28-1-302.

Of course, a cardinal rule of statutory construction is "[t]he Court must construe a statute as a whole, and consider all sections of applicable statutes together to determine the intent of the legislature." *Davaz v. Priest River Glass Co.*, 870 P.2d 1292, 1295 (Idaho 1994) (internal citation omitted). Additionally, Courts must "give a statute an interpretation that will not render it a nullity." *State v. Nelson*, 807 P.2d 1282, 1285 (Idaho Ct. App. 1991).

The Court concludes that if the legislature meant to allow parties to shorten limitations period for the actions alleged here, it would have said so more specifically – just as it did with regard to actions for "breach of any contract for sale." Idaho Code § 28-2-725. *Cf. Jones v. Wells Fargo Bank, N.A.*, 2011 WL 710877, at *7 (N.D. Tex. Feb. 25, 2011) (rejecting bank's assertion that plaintiff's breach of contract action was barred by six-month period specified in account agreement; relying on Texas statutory law similar to Idaho Code § 29-110).

The bank also points to Idaho Code § 28-1-302(b), which provides: "Whenever the commercial code requires an action to be taken within a reasonable time, a time that is not manifestly unreasonable may be fixed by agreement." This language, however, does not speak to limitations periods. Limitations periods do not require plaintiffs to sue "within a reasonable time." Rather, plaintiffs must sue within very specific time periods. The bank does not point to any applicable code section that "requires an action to be taken within a reasonable time." Granted, customers are obligated to "exercise

reasonable promptness" in examining statements for forgeries and alterations. *See* Idaho Code § 28-4-406. So, in theory, the parties may agree upon specific time periods in which the customer may alert the bank of these problems. But, as already discussed, forgeries and similar alterations are not at issue here. Or, stated differently, the bank cannot point to any UCC provision requiring customers to alert the bank of the bank's failure to abide by restrictive indorsements within a reasonable period. Thus, there is no underlying "reasonable" period of time subject to modification by agreement.

In sum, the provision of Deposit Account Agreement entitled *Your Duty to Examine Your Statement* does not bar DelJack's suit.

**B.      Waiver**

The bank next argues that DelJack waived its right to sue the bank for failing to comply with the restrictive indorsement. The bank again relies on the terms in the Deposit Account Agreement with its customer, this time pointing to the following language, which has nothing to do with restrictive indorsements:

> **REQUIRED SIGNATURES.**
>
> **Signature Comparison.** We process items mechanically, based on information encoded on checks and other transaction items, and we are not required to examine items and debits drawn on your account. We collect your signature to obtain your agreement to the rules we establish for your account, but this does not create any responsibility on our part to verify signatures on items and other charges to your account.
>
> **Number of Signatures.**  You agree that if you
> (1) have an account in which more than one signature is required to complete a transaction;
> (2) authorize someone to transact some but not all transactions on your account;

> (3) authorize someone to transact business on your account for
>      limited purposes and no others; or
> (4) use checks that require two or more signatures,
>
> such arrangements are strictly between you and the other person(s)
> you authorize, whether we have notice of your arrangement
> (including in a form we provide you) or not. *You cannot assert a
> claim against us for permitting a transaction so long as any one of
> the owners or authorized persons sign or initiate the transaction,
> even if a person exercises more authority than you have given.*

*Deposit Account Agreement,* Ex. D-3 to Leonard Aff., Dkt. 35-10, at 17 (emphasis

added).  Focusing on that last, italicized sentence, the bank argues that Jody Ballard-

Morrison – an authorized signatory on the DelJack account – "signed or initiated" the

"transaction that ultimately gave rise to the unauthorized obfuscation of money by

Hurles."  *Defendants' Mot. Memo.*, Dkt. 35-1, at 13.  In other words, Ballard-Morrison

signed the check and then gave it to Hurles to deposit.  The bank thus concludes that

DelJack cannot complain because Hurles "exercised more authority" than given – i.e., by

cashing the check rather than depositing it, as she was instructed to do.

    This argument lacks merit.  This portion of the Deposit Account Agreement does

not contain a waiver – much less a "clear and unambiguous" waiver – of DelJack's

ability to sue the bank for failing to follow the restrictive, "for deposit only" indorsement.

To read a waiver into the provision, one is essentially forced to read the phrase

"permitting a transaction" as "violating a restrictive indorsement" – as in, *You cannot

assert a claim against us for violating a restrictive indorsement so long as one of the

owners or authorized persons sign or initiate the transaction.*  This interpretation of the

contractual language is strained.  At a very minimum, the Court cannot find a clear and

unambiguous waiver of the right to sue within this language.  U.S. Bank's motion for summary judgment will therefore be denied.

## DELJACK'S MOTION FOR SUMMARY JUDGMENT

The Court now turns to DelJack's motion for summary judgment.  As will be explained, the Court will deny this motion as well because there are triable factual issues regarding the scope of Hurles' authority to act on DelJack's behalf.

### A.    Conversion & Presumed Damages

DelJack argues it is entitled to summary judgment on its conversion claim because there is no dispute that the bank ignored the restrictive indorsement on the For-Deposit-Only Checks.  Idaho Code § 28-3-206(3)(c) generally provides that when a bank disregards a restrictive indorsement, it converts the instrument.  More specifically, it states that a payor bank who takes an instrument (such as a check) for immediate payment over the counter "converts the instrument unless the proceeds of the instrument are received by the indorser or applied consistently with the indorsement."  Idaho Code § 28-3-206(3)(c).  Another section of the Idaho Commercial Code provides that if an instrument is converted, damages are "presumed to be the amount payable on the instrument, . . . ."  Idaho Code § 28-3-420(2).

Here, the bank does not dispute that 127 For-Deposit-Only Checks contained restrictive indorsements indicating they should be deposited into DelJack's bank account.  Nor is there any dispute that U.S. Bank is a payor bank that cashed the checks, rather than following the restrictive indorsement.  By establishing these facts, damages are presumed in the amount of $86,500.  The only remaining question is whether the bank will be able

to rebut this presumption.

The bank, however, argues that damages are not presumed because § 28-3-206(3)(c) provides that a conversion is established "*unless* the proceeds of the instrument are received by the indorser . . . ." (emphasis added).[6]  Based on this clause, the bank argues that to prove damages, DelJack must not only prove that the bank ignored the restrictive indorsement by failing to deposit the check, but that DelJack must also prove it did not get all the money back at some later point.

This argument lacks merit.  The bank converted the checks right when it delivered cash over the counter instead of depositing the money into a DelJack account.  *See generally Read v. Downey State Bank,* 392 P.2d 681 (Idaho 1964) ("'The conversion is complete when the defendant takes, detains or disposes of the chattel.'") (citation omitted); *Society Natl. Bank v. Security Fed. S. & L.,* 643 N.E.2d 1090, 1095 (Ohio 1994) ("At the moment that Security Federal honored that latter request [to pay a check inconsistently with a restrictive indorsement], it incurred liability in conversion to

---

[6] In relevant part, § 28-3-206(3)(c) provides:

(3)   If an instrument bears an indorsement (i) described in section 28-4-201(2), or (ii) in blank or to a particular bank using the words "for deposit," "for collection," or other words indicating a purpose of having the instrument collected by a bank for the indorser or for a particular account, the following rules apply:

. . .
. . .

(c)   A payor bank that is also the depositary bank or that takes the instrument for immediate payment over the counter from a person other than a collecting bank converts the instrument *unless the proceeds of the instrument are received by the indorser or applied consistently with the indorsement.*  (emphasis added).

Microtek.").  At that moment, damages were incurred and presumed to be in the face amount of the check.  *See* Idaho Code § 28-3-420.  The fact that some of the money may have made its way back to DelJack does not mean the conversion never happened in the first place.  In other words, DelJack does not have the obligation to trace the money once the bank ignored the indorsement; it is presumed to have suffered damaged.  *Cf. Indus. Plumbing & Heating Supply Co. v. Carter County Bank*, 154 S.W. 2d 432, 435 (Tenn. Ct. App. 1941) ("When the agent withdrew and appropriated the money, the burden was not upon the plaintiff to trace the money further and show by the proof that the agent did not place the money in the register of the company and then withdraw it. The bank in wrongfully cashing the check caused the loss. The plaintiff is entitled to recover.")

This is not to say that the bank has no defenses, however, or that it cannot seek to rebut the presumed damages of $86,500.  Indeed, DelJack concedes that the bank has a right to attempt to rebut the damages DelJack presumptively suffered.  *Cf., e.g., Saxon Mortg. Servs., Inc. v. Harrison,*  973 A.2d 841, 865 (Md. Ct. App. 2009) ("the presumed fact that the plaintiff's damages equal the full amount payable on the instrument remains unless and until evidence is introduced by the party seeking to rebut the presumption that the plaintiff's actual interest in the check entitles the plaintiff to a lesser amount").  But attempting to rebut the presumed damages is a defense – meaning the bank, not DelJack, carries the burden of proof.  *Cf. D&G Equip. Co. v. The First Nat'l Bank of Greencastle, Penn.*, 764 F.2d 950, 957, 959 (3d Cir. 1985) (defendant attempted to overcome presumed damages under former version of commercial code § 3-420 by "a defense of mitigation of damages"; court rejected the defense, as bank did nothing more than claim

that the converted funds were generally applied to plaintiff's benefit).  Notably, the bank has not cited any cases supporting its view that conversion plaintiffs do not enjoy presumed damages under the commercial code.  The Court will therefore analyze the bank's arguments regarding DelJack's conversion claim with this presumption in place.[7]

Here, the bank puts forward two theories in an attempt to rebut DelJack's presumed damages.  First, the bank says that when it gave cash to Hurles, it effectively gave the cash to DelJack because Hurles was DelJack's agent.  Next, the bank argues that even if Hurles was not an agent, she delivered all the cash to DelJack anyway.

**B.    Agency**

Turning first to the agency argument, the Court finds there are triable issues of fact regarding the scope of Hurles' agency.  Unless the evidence is undisputed, the scope of an agency relationship is a question of fact, and the burden of proof rests on the party asserting the relationship.  *See generally MGIC Indemnity Corp. v. Moore*, 951 F.2d 361 (9th Cir. 1991); *Bailey v. Ness*, 708 P.2d 900, 903 (Idaho 1985).

The bank argues that Hurles had either actual or apparent authority to cash the

---

[7] Given that the Court has found that damages are presumed on the conversion claim, and that it is up to the bank to rebut those damages, it would appear that DelJack's claims for negligence and declaratory relief will fall by the wayside.  In its briefing, DelJack suggested that these claims would be moot if damages were presumed on the conversion claim.  *See* Reply, Dkt. 55, at 2 n.2 ("[T]he Court will note the additional counts to "conversion" in Plaintiff's Complaint are plead in the alterative, 'as to as many checks as are not properly the subject of [the conversion count]', so affording strict liability on the conversion count moots the other counts.").  At this juncture, however, the Court will merely deny DelJack's motion for summary adjudication of these claims.  Among other things, DelJack did not meaningfully brief these claims in moving for summary judgment, focusing instead on the conversion claim.  Consequently, the Court is in no position to find "there is no genuine dispute as to any material fact" on these claims, or that DelJack "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

For-Deposit-Only Checks and return that cash to the business.

Actual "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Restatement (Second) of Agency* § 26; *see also Hayward v. Yost*, 242 P.2d 971, 981 (Idaho 1952).

Here, DelJack insists Hurles had no authority to cash the For-Deposit-Only checks. But Hurles said DelJack authorized her to go to the bank, cash these checks, and return to the bar with the cash. *See Hurles Dep.*, Dkt. 52-4, at 146:22 to 147:2. The fact-finder will need to resolve this dispute. If Hurles' authority included receiving cash on behalf of DelJack, then the jury could conclude that DelJack did not suffer any damages when Hurles cashed the For-Deposit-Only Checks.[8]

The Court cannot conclude, however, that there are triable issues of fact as to Hurles' apparent authority to act on DelJack's behalf – mainly because the bank did nothing to ascertain the scope of Hurles' authority.

"Apparent authority exists when the principal voluntarily places an agent in such a position that a person of ordinary prudence, conversant with the business usages and the nature of a particular business, is justified in believing that the agent is acting pursuant to existing authority." *Hausam v. Schnabl*, 887 P.2d 1076, 1080 (Idaho Ct. App. 1994). The

---

[8] DelJack argues that the bank's ability to rebut the presumed damages is doomed to failure because the bank failed to keep any records of who actually cashed the For-Deposit-Only Checks. But when the evidence is viewed in the light most favorable to the bank, it would appear that Hurles was at the bank almost daily and DelJack does not contend anyone else absconded with cash from any of the For-Deposit-Only Checks. Under these circumstances, the jury could conclude that DelJack did not suffer any losses if Hurles received proceeds from the For-Deposit-Only Checks on DelJack's behalf.

apparent power of the agent is determined by the principal's acts – not the agents.  *Id.*  As such, "[t]he declarations of an alleged agent, standing alone, are insufficient to prove the grant of power exercised by the agent and to bind the principal to third parties."  Rather, the purported principal "must do something to lead the third party to believe that the ostensible agent has authority."  *Id.*  Further, the person asserting apparent authority "must use reasonable diligence to ascertain the agent's authority . . . ." which "encompasses a duty to inquire with the principal about the agent's authority."  *Id.* (citations omitted).

Here, Hurles was not a signatory on DelJack accounts, which should have, at a minimum, given the bank reason to question whether she was authorized to cash the For-Deposit-Only checks.  Yet the bank never asked DelJack about the scope of Hurles' authority.  These facts, even when viewed in the light most favorable to the bank, do not support an inference that the bank – as "a person of ordinary prudence, conversant with the business usages and the nature of a particular business" would be "justified in believing that the agent is acting pursuant to existing authority."  *Id.*

**C.    Hurles' Alleged Return of the Cash to DelJack**

The bank's next attempt to rebut the presumed damages is based on its theory that even if Hurles was not DelJack's agent, she returned to DelJack every penny of the cash U.S. Bank gave her in exchange for the For-Deposit-Only Checks.

This argument came as a bit of a surprise because in moving for summary judgment, the bank submitted – as an undisputed fact – that Hurles embezzled money

from DelJack by "cashing the ATM Checks[9] and keeping the cash."  *See Bank's Statement of Undisputed Facts,* Dkt. 35-2, ¶ 26.  After filing its motion, however, the bank deposed Hurles.  Hurles testified that she always returned to the bar with the cash from the For-Deposit-Only Checks and placed it in the petty cash fund.  She admitted taking money from DelJack's petty cash, but said she took money from petty cash when she restocked the bar's ATM.  So, according to the bank, DelJack did not suffer any damages because Hurles immediately returned all the converted cash to the bar.  The flaws in this argument are discussed below.  Before discussing that argument, however, the Court will first address a couple preliminary items – one factual, and one legal.

### 1.  The Petty Cash System at DelJack

First, from a factual standpoint, to follow the bank's argument, it is helpful to follow the money – and, in particular, the money in DelJack's petty cash fund.

The parties agree that DelJack used money from its petty cash fund to restock the ATM located in the bar.  To keep track of cash taken out of petty cash and put into the ATM, DelJack would write checks, payable to cash (these would include the For-Deposit-Only Checks), and put those checks into the petty cash fund.  The company checks inside the petty cash fund basically served as a marker, because the bar would later take cash from its operations and replace the checks.  The checks were then "sold" into the daily deposit, and were supposed to be deposited, along with other cash from daily operations, into DelJack's account at Bank of the West.

DelJack says these checks had just one purpose – to be deposited.  The bank,

---

[9] The For-Deposit-Only Checks and the ATM Checks are the same.

however, says that if on any given day, DelJack did not have enough cash from its operations to replace a check, Hurles was tasked with cashing that check (rather than depositing it) and bringing the cash directly back to the petty cash fund.

The bank relies on Hurles' deposition testimony to make this argument, which leads to the second preliminary issue: DelJack argues that Hurles' deposition testimony is barred by the sham affidavit rule. The Court is not persuaded.

### 2. The Sham Affidavit Rule

The sham affidavit rule precludes parties from creating an issue of fact by submitting affidavits that contradict prior deposition testimony. *See generally Nelson v. City of Davis,* 571 F.3d 924, 927-28 (9th Cir. 2009). Here, DelJack does not point to an affidavit that contradicts underlying deposition testimony. Rather, DelJack argues that Hurles' deposition testimony contradicts *her attorney's* summary of her conduct during her criminal sentencing hearing. DelJack has not offered any authority or explanation justifying such a broad extension to the sham affidavit rule.

The next problem is that Hurles is not a party to this lawsuit. It is thus unclear whether the sham affidavit rule would prevent her from submitting a contradictory affidavit. As the Ninth Circuit explained, "[t]he rationale underlying the sham affidavit rule is that a *party* ought not be allowed to manufacture a bogus dispute with himself to defeat summary judgment. That concern does not necessarily apply when the dispute comes from the sworn deposition testimony of another witness. *Id., citing Lane v. Celotex Corp.*, 782 F.2d 1526, 1531 (11th Cir.1986) ("[W]hile a district court may find that a party's contradictory affidavit constitutes a sham, ... we would be unable, absent great

trepidation, to affirm a similar finding with respect to a disinterested witness'
contradictory affidavit.") (internal citation and footnote omitted).

Finally, even assuming DelJack could somehow overcome these problems, the
sham affidavit rule likely would not apply because Hurles' deposition testimony does not
flatly contradict her attorney's summary of her conduct.  *Cf. generally Kennedy v. Allied
Mutual Ins. Co.,* 952 F.2d 262, 266-67 (9th Cir.1991) (sham affidavit rule "does not
automatically dispose of every case in which a contradictory affidavit is introduced to
explain portions of earlier testimony.'").  At the criminal sentencing, Hurles' attorney
said Hurles would cash checks for $1000 or $1500, and then keep $200 to $300 for
herself.  At her deposition, Hurles said that this was not exactly how it happened.  She
said she returned the money she received from the bank to the bar (to ensure that the
petty cash fund balanced) and that she took cash from petty cash when she restocked the
ATM machine.  Thus both Hurles and her attorney agreed that Hurles took some money
from DelJack.  *See Hurles Dep.* at 95:23 to 96:5.  So the sham affidavit rule arguably
would not apply here in any event because Hurles' testimony can be viewed as
explanatory, rather than contradictory.

### 3.   The Bank Cannot Rebut DelJack's Presumed Damages Merely By Arguing that Hurles Re-Delivered the Converted Cash to DelJack

But the Court is not convinced that the bank can rebut DelJack's presumed
damages based on Hurles' testimony that she returned all the cash to DelJack.

In a conversion action, the general rule is that a wrongdoer may be able to lessen
damages award by returning the property.  But, among other things, the plaintiff needs to

accept the return.  *See Read*, 392 P.2d at 686 (In a conversion action, "[t] he defendant cannot undo his wrong by forcing the goods back upon their owner, either as a bar to the action, or in mitigation of damages. '[¶] . . . In any case, the return of the chattel, *whether consented to by the plaintiff* or compelled by the court, does not bar the action, but merely goes to reduce the damages.'") (quoting *Prosser on Torts* § 15 (2d ed. 1955) (emphasis added)); *see generally* 18 Am. Jur. 2d *Conversion* § 137 ("The damages recoverable in an action for conversion may be reduced by the return of the goods to and acceptance of the goods by the plaintiff, at least where such return and acceptance occur prior to the beginning of the action.") (footnote omitted); *Restatement (Second) of Torts* § 922.[10] Here, there is no evidence that the bank proffered some return of the cash to DelJack. Nor does the bank cite any authority for the proposition that a conversion tortfeasor can get a credit against presumptive damages because a third party (Hurles) allegedly returned the converted property to the plaintiff – all unbeknownst to the conversion plaintiff.  In other words, before a return can be accepted, DelJack would need to know about the conversion first, and then accept return of the converted cash.

Further, even if this approach were acceptable, the more logical way to deal with Hurles' return of cash to DelJack would be to subtract from her "payments" any amounts

---

[10] Section 922 of the Restatement of Torts provides:

 **Return Or Tender Of Return Of Converted Chattel**
(1) The amount of damages for the conversion of a chattel is diminished by its recovery or acceptance by a person entitled to its possession.
(2) The amount of damages may, in the discretion of the court, be diminished by a tender of return of the chattel to one entitled to its possession if
    (a) it was converted in good faith and under a reasonable mistake, and
    (b) its value to the one entitled to possession is not substantially impaired, and
    (c) the tender is made promptly after discovery of the mistake and is kept open.

that she took from DelJack's.  In other words, if the bank could prove the precise

amounts Hurles took from DelJack, it would be able to extrapolate the "payments" Hurles

made against the conversion liability.  By the bank's own reckoning, this is an impossible

task, which would force a jury to rely on sheer speculation in coming up with any figure.

As the bank explained, "asking U.S. Bank to prove that . . . Plaintiff did not actually

sustain the losses it claims . . . is impossible in all respects and therefore manifestly

unjust, especially given that Plaintiff has admitted it did not make or keep the records that

would be required for any outside entity such as U.S. Bank to be able to make any sort of

accurate evaluation of the losses alleged by Plaintiff." *Opp.,* Dkt. 51, at 8.

Obviously, it is unfortunate that DelJack does not have better records.  But in

complaining about the unfairness of being penalized due to DelJack's alleged sloppy

record-keeping, the bank fails to fully appreciate that it converted the checks in the first

place.  In any event, the bank has not persuaded the Court that there is a triable issue of

fact based on its argument that Hurles returned cash to DelJack.

As explained earlier, however, DelJack's motion for summary judgment fails for

other reasons. The Court will therefore deny the motion.

## MOTION TO AMEND TO SEEK PUNITIVE DAMAGES

The Court will also deny DelJack's motion to amend its complaint to add a prayer

for punitive damages.

Whether plaintiff should be allowed to amend its complaint to seek punitive

damages is a substantive question controlled by Idaho law. *See Doe v. Cutter Biological*,

844 F. Supp. 602, 610 (D. Idaho 1994). The trial court decides, in its discretion, whether

to submit the punitive damages issue to the jury.  *Manning v. Twin Falls Clinic & Hosp.*, *Inc.*, 830 P.2d 1185, 1190 (Idaho 1992).

Under Idaho law, an award of punitive damages ultimately requires a bad act and a bad state of mind.  *Todd v. Sullivan Const. LLC*, 191 P.3d 196, 201 (Idaho 2008) (citing *Myers v. Workmen's Auto. Ins. Co.*, 95 P.3d 977, 985 (Idaho 2004)).  The defendant must act (1) in a manner that was an extreme deviation from reasonable standards of conduct with an understanding of – or disregard for – its likely consequences, and (2) with an extremely harmful state of mind, described variously as with malice, oppression, fraud, gross negligence, wantonness, deliberateness, or willfulness.  *Myers*, 95 P.3d at 983.

At trial, plaintiff must satisfy this standard by clear and convincing evidence. Idaho Code § 6-1604(1).  For purposes of the motion to amend, plaintiff must show "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages."  Idaho Code § 6-1604(2).

DelJack has failed to make this showing.  Based on the evidence submitted, the only reasonable inference is that, even assuming the bank acted negligently, it did not act with an extremely harmful state of mind.  *See Myers,* 95 P.3d at 983.  As the bank points out: Hurles showed up at the bank almost daily; she was known as a DelJack employee; and Hurles cashed these checks for years with no complaint from DelJack.  These facts show that the bank did not act with a harmful state of mind.  *Cf., e.g.*, *D&G Equip Co. v. First Nat'l Bank*, 764 F.2d 950 (3d Cir. 1984) (denying punitive damages claim; although bank's actions "may have been lacking in prudence, D&G has failed to establish that the bank's actions resulted from malice, indifference, or recklessness."); *Sherrill White*

*Constr., Inc. v. S.C. Nat'l Bank*, 713 F.2d 1047 (4th Cir. 1983) (reversing punitive

damages award; bank acted negligently in cashing checks but did not act maliciously

with any intention to injure plaintiff, nor was its conduct "otherwise conscious or reckless

so as to justify punitive damages").  The Court therefore declines to allow DelJack to

seek punitive damages.

## ORDER

Both parties' motions for summary judgment (Dkts. 35, 37) are **DENIED.**

DelJack's motion for leave to file an amended complaint to seek punitive damages (Dkt.

36) is also **DENIED.**

A **jury trial** shall begin on **January 15, 2013, at 9:30 a.m.** in the Federal

Courthouse in **Boise**, Idaho.[1]   The trial is tentatively scheduled for four (4) days.

Thereafter, the trial shall be conducted from 9:00 a.m. to 4:00 p.m.  A continuance for

reason will be granted only upon a showing of extraordinary circumstances.

If the matter to be tried is changed to a court trial, suggested Findings of Fact and

Conclusions of Law are to be submitted at least fourteen (14) days before trial.  Attach an

index directing the Court's attention to the evidence that will support the proposed

findings or conclusions of law.  A stipulation on all non-contested issues should

accompany these documents.

---

[1] The parties are further advised that criminal matters may also be set on that date, which
would supersede all civil settings; however, civil matters would commence in the
order set at the conclusion of any criminal proceedings, if time allows.

Witness lists shall be filed fourteen (14) days prior to trial, unless otherwise ordered or agreed upon.  Witness lists shall contain the material listed in Fed. R. Civ. P. 26(a)(3)(A)&(B), and shall include a brief description of  the subject matter of the witnesses' expected testimony.

Exhibit list shall be exchanged between the parties and submitted  to the Court within fourteen (14) days prior to trial.  The exhibit lists shall follow the guidelines set out in Local Rule 16.3.  Plaintiff's Exhibits should be numbered and listed starting with "1."  Defendant shall contact Ms. Anne Lawron, In-court Deputy, 334-9022, to receive their exhibit numbers.  If either side has  multiple parties or numerous exhibits, contact Ms. Lawron   for number assignments.  Each exhibit should be labeled with a color-coded sticker. (Yellow for plaintiff; blue for defendant.  Stickers are available at the Clerk's Office, US courthouse.)  The number of the exhibit and number of the case should be on all exhibits.  A copy of the exhibits should be delivered to opposing counsel. A set of originally marked exhibits and a copy of the exhibit list shall also be delivered to Ms. Lawron on the day of trial, along with two complete sets of exhibit copies and exhibit lists for use of the Court and staff attorney.  Impeachment exhibits will be marked, sealed and delivered only to the Court.  Except for good cause shown, no exhibits or testimony will be received in evidence at trial unless presented in accordance with this order.

Trial briefs shall be exchanged between the parties and submitted to the Court within fourteen (14) days prior to trial.  The Court is to be advised and briefed on all anticipated evidentiary problems before trial; no motions will be heard on the morning of a trial unless approved by the court in advance.

All proposed jury instructions are required to be filed and served at least fourteen (14) days prior to trial.  The proposed jury instructions shall follow the guidelines set forth in Local Rule 51.1.  Proposed jury instructions shall also be provided to chambers by sending a "clean" set without cites or numbers, to EJL_Orders@id.uscourts.gov .

All proposed voir dire questions are to be filed at least fourteen (14) days prior to trial.  The Court will conduct voir dire of the jury panel.  Counsel will be allowed to briefly question the jury panel following the Court's voir dire.

When appearing in this Court, all counsel (including, where the context applies, all persons at counsel table) shall abide by the following rules.  Failure to abide may result in sanctioning by the Court:

Stand as Court is opened, recessed or adjourned.

Stand when jury enters or retires from the courtroom.

Stand when addressing the Court. When making an objection, stand and state only the legal basis for the objection.  If a response is necessary, be brief, without making a speech.  If it is critical to the case that counsel be heard in more detail, a bench conference may be called to explain the basis for an objection. Otherwise, bench conferences will not be permitted.

Stand at the lectern while examining any witnesses; except that counsel may approach the witness for purposes of handling or tendering exhibits, with Court approval.

Stand at the lectern while making opening statements or closing arguments.

Address all remarks to the Court, not to opposing counsel.

Avoid disparaging personal remarks or acrimony toward opposing counsel and remain wholly detached from any ill feelings between the litigants or witnesses.

Refer to all persons, including witnesses, other counsel and the parties by their surnames and not by their first or given names.

Only one attorney for each party shall examine or cross examined each witness. The attorney stating objections, if any, during direct examination, shall be the attorney recognized for cross examination.

Prior to testifying, counsel shall place before the witness all exhibits to which he or she will testify.

Diagrams or exhibits should be drawn or marked by the witness before taking the stand.

Any witness testifying at the time of recess or adjournment must be back on the witness stand when the Court reconvenes. If a new witness is to be called, he/she must be standing in front of the witness box ready to be sworn.

In examining a witness, counsel shall not repeat or echo the answer given by the witness.

Gestures, facial expressions, audible comments, or the like, as manifestations of approval or disapproval during the testimony of witnesses, or at any other time, are absolutely prohibited.

SO ORDERED.

DATED: September 26, 2012

Edward J. Lodge
United States District Judge